IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHWESTERN DIVISION

| | |
|---|---|
| LUGINE GASTON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 11-5095-CV-SW-NKL-SSA |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

Before the Court is Plaintiff Lugine Gaston's Social Security Complaint [Doc. # 3]. Gaston argues the Administrative Law Judge ("ALJ") failed to follow the *de minimus* standard when determining Gaston did not suffer from a single severe impairment and the ALJ failed to fully and fairly develop the record. Because the ALJ failed to apply the proper credibility analysis under *Polaski v. Heckler* and to adequately develop the medical record, the Court remands the case to the ALJ for reconsideration consistent with this opinion.

**I.    Background[1]**

Gaston challenges the Social Security Commissioner's denial of his claims for Disability Insurance Benefits under Title II of the Social Security Act ("the Act") and

---

[1] The facts and arguments presented in the parties' briefs are duplicated here only to the extent necessary. Portions of the parties' briefs are adopted without quotation designated.

Supplemental Security Income under Title XVI of the Act. *See* 42 U.S.C. §§401, *et seq.* and 1381, *et seq.*

**A. Factual Evidence**

Gaston alleges he became disabled on June 1, 2009 on the basis of hypertension, hyperlipidemia, dyslipidemia, type II diabetes, a prostate condition, an inguinal hernia, left upper extremity pain and calf pain.

The medical evidence begins on April 27, 2007. On that date, Gaston was incarcerated with the Missouri Department of Corrections and was medically treated for blurred vision changes with reading. (Tr. 329). Gaston was then diagnosed with hypertension. Gaston was again treated July 10, 2007 and showed further impairments due to hypertension. He was diagnosed with impaired cardiovascular status and potential, related to hypertension and hyperlipidemia. (Tr. 323, 320)

On July 19, 2007, Gaston was treated for hypertension and hyperlipidemia, and was diagnosed with type II diabetes. (Tr. 316-317). Gaston was later seen for vision problems and was diagnosed with pre-proliferative retinopathy due to diabetes and hypertension. *Id.* These impairments were noted on August 2, 2009, during a check-up at the Community Clinic of Joplin. (Tr. 199).

On November 11, 2008, Gaston was seen by G. Scott Brehn, M.D. and a guided ultrasound biopsy of Gaston's prostate was performed. The tests showed a prostate specific antigen (PSA) level of 4.5. (Tr. 235). Gaston was then diagnosed with adenocarcinoma of the prostate with a Gleason's score of six. *Id.* On December 1, 2008,

Dr. Brehm opined that Gaston's prostate cancer needed to be treated and the best course of action was a prostatectomy. (Tr. 235).

Gaston underwent a radical retropubic prostatectomy with bilateral pelvic lymph node dissection at St. John's Regional Medical Center in Joplin, Missouri on January 15, 2009. (Tr, 251). Gaston was discharged from the hospital on January 18. (Tr. 193). The biopsy results showed no evidence of metastic carcinoma in the right or left lymph node. (Tr. 212). Additionally, these labs showed adenacarcinoma of the prostate, Gleason's grade 3, 4 with a score of 7 involving both the right and left lobes of the prostate. *Id.* Perineural invasion was also noted. *Id.*

On January 26, 2009, Gaston met with Dr. Brehm for a follow-up from his prostatectomy. (Tr. 207). During this appointment, Dr. Brehm removed Gaston's catheter and surgical staples. *Id.* Dr. Brehm reported that the cancer appeared to be confined to the prostate, but did note perineural invasion. *Id.* Another follow-up was attended February 13, 2009, noting Gaston was doing well and a PSA test was done. An additional follow-up March 12, 2009, noted that PSA was undetectable. *Id.*

During the follow-up visit on February 13, 2009 Dr. Brehm noted a small right inguinal hernia. (Tr. 207) In November of 2009, Gaston was seen by Dr. Lewis Sandidge, M.D., at the Community Clinic of Joplin, where it was noted that he suffered from a right inguinal hernia that was quite large and in need of repair. (Tr. 240) The hernia was noted again on May 11, 2010, at Freeman Health Systems. (Tr. 273). While Gaston was informed of the need to repair the hernia, he did not seek further treatment, citing

3

financial difficulties.

On August 12, 2009, Plaintiff presented at a medical clinic for a general checkup (Tr. 199). He told an examining nurse practitioner that he felt well overall (Tr. 199). The nurse practitioner diagnosed type-two diabetes under "fair" control, high cholesterol, and hypertension (Tr. 199). The nurse practitioner prescribed cholesterol and blood-sugar medications, and advised Plaintiff to modify his diet (Tr. 199).

Plaintiff went to the emergency room on August 22, 2009, to seek care for pain in one of his shoulders (Tr. 278, 284).3 Plaintiff did not recall injuring his shoulder (Tr. 280). The hospital discharged him later that day (Tr. 284).

On November 11, 2009, Gaston was also treated for pain in his upper left extremity. (Tr. 225). Dr. Sandidge opined that the pain was likely caused by soft tissue etiology, but no further diagnosis was done. *Id.* Gaston was also seen on at Freeman Health Systems on May 6, 2009 regarding left shoulder pain. (Tr. 280)

On December 9, 2009, Susie Henry, a single decision maker, who is not considered a medical source, reviewed Gaston's medical records in order to assess his physical residual functional capacity (RFC). (Tr. 226-231). Ms. Henry opined that Gaston was limited to lifting twenty pounds occasionally, and ten pounds frequently. She further opined that Gaston could stand or walk six hours in an eight hour day, sit six hours in an eight hour day, and was not limited in his ability to push and pull. (Tr. 227). She noted no postural, manipulative, visual, communicative, or environmental limitations. (Tr. 228-229). Ms. Henry stated that the limitations assessed were due to a "rather large hernia,"

and for shoulder pain. (Tr. 227). She noted that Gaston's prostate problem would not severely restrict his function. *Id*.

### B. The Administrative Hearing

When Gaston appeared before the ALJ on August 24, 2010, he was accompanied by his counsel, Ryan Dexter. Gaston testified he dropped out of school after tenth grade and then went on to obtain his General Education Diploma. (Tr. 19). Gaston testified that he has not received any kind of vocational training. *Id.* Gaston stated that the last time he held employment was at the end of 2008, after he got out of the hospital. *Id.* He testified that he last worked for a moving company and he had worked there for about a year and a half. (Tr. 20). He left that job after being incarcerated in 2007 for child endangerment. *Id.* He tried to return to the moving company after being released from prison, but was unable to. (Tr. 22)

Gaston then testified he previously worked for Associated Redi-Mix as a truck driver. *Id.* According to Gaston's testimony, while driving for Redi-Mix, the truck he was driving turned over and his leg was "crushed" between the driver's seat and dashboard. (Tr. 20-21). This accident "put a hole through [his] leg," and now he has sharp pains which go through his calves after standing for three to four hours. (Tr. 20).

Gaston testified that he worked for McDonald's for a short period of time in 2008 after being released from prison. (Tr. 22) He attempted to return to work at McDonald's after having his prostatectomy, but was unable to because he was required to lift mop

buckets and grease pails. *Id.* Gaston also testified that he worked for Labor Finders for about a week and did general labor such as working at trash refuges. *Id.*

Gaston further testified that, since being diagnosed with diabetes, he has had muscle spasms in his thighs. (Tr. 23). Also, he testified that he broke his right hand when working for the carnival ten years ago and now has severe cramps in that hand. *Id.* Gaston further stated he injured his left shoulder while working for the moving company and that his right shoulder pops out of socket. *Id.*

Gaston also testified at the hearing that he recently developed pain in his right elbow. (Tr. 24). He stated he sought treatment for the right elbow at the Freeman Health Clinic two weeks prior to the administrative hearing. (Tr. 24). According to Gaston, he was told by the Freeman Clinic that he had tennis elbow and was given steroids and a pain medication to treat the elbow. *Id.*

Gaston then testified regarding his hernia. *Id.* He stated the hernia causes him pain, especially when walking a distance greater than four blocks or lifting anything heavier than ten pounds. (Tr. 25). Gaston stated a doctor with St. John's hospital placed a ten pound lifting restriction on him, but he cannot recall the name of the doctor. *Id.* Gaston also testified he has pain when sitting down for an extended period of time and when the hernia "is out." *Id.* When the hernia is displaced, Gaston has to lie down and push it back in place; this occurs two or three times a day. *Id.*

Next, Gaston testified regarding the effects of the prostatectomy. He stated that he has pain in the lower region of his stomach, where the incision was made, and that this is exacerbated by lifting and cold weather. *Id.*

Finally, Gaston testified as to his diabetes and its effect on his ability to work. He testified he takes Metformin for his diabetes and that his diabetes is "pretty much controlled" with the Metformin. (Tr. 29). But, Gaston did state that he does become nauseated because of the medication if he does not eat anything in the morning. *Id.* Gaston also testified as to the effects of his high blood pressure. *Id.* According to Gaston, when his blood pressure increases, he gets migraine strength headaches. *Id.* He has these headaches approximately twice a week. *Id.* He stated that to get rid of the headaches he has to lay down and sleep for approximately four hours. (Tr. 30).

At the administrative hearing, there was no testimony beyond that given by Gaston; no vocational expert testified as to Gaston's ability to obtain employment.

### C. The ALJ Decision

In the September 2010 decision, the ALJ found Gaston met the insured status requirements of the Social Security Act through June 30, 2014. (Tr. 10) The ALJ also found Gaston had not engaged in substantial gainful activity since June 1, 2009. *Id.* The ALJ examined each one of Gaston's ailments finding none of them provided sufficient medical signs or laboratory findings to demonstrate the existence of a medically determinable physical or mental impairment.

With regard to the effects of Gaston's prostatectomy, the ALJ found since

7

Gaston reported no residual problems from the prostatectomy, except for urinary urgency that was improving, Gaston did not suffer from a severe impairment. (Tr. 11)

The ALJ then examined Gaston's diabetes. The ALJ found Gaston's complaints of muscle spasms in his legs due to diabetes was not substantiated by the medical record. *Id.* Further, the ALJ stated Gaston's only other reported symptom was eye discomfort after watching television for a prolonged period of time. *Id.* Since there were no reports of more serious medical symptoms nor was there medical record of any of the symptoms, the ALJ found the impairment to be non-severe. *Id.*

Next, the ALJ considered Gaston's hypertension. Although Gaston testified to having migraines regularly due to the hypertension, the ALJ found Gaston's hypertension was controlled by medicine and there was no evidence to corroborate his allegations of migraines. *Id.* Therefore, the ALJ found the hypertension to be a non-severe impairment.

Then the ALJ analyzed Gaston's claim of a right inguinal hernia. The ALJ noted that the hernia was first reported to be small and asymptomatic, but that it was later noted to be quite large and in need of repair. *Id.* The ALJ also noted Gaston was referred to St. John's to have the hernia repaired but he had not undergone the procedure. *Id.* While the claimant testified he was unable to lift more than ten pounds, the ALJ stated there was no indication of such a restriction

8

on the medical records and that the records did not document reports of high levels of pain as Gaston had testified. *Id.* Further, the ALJ found there was no indication that Gaston's hernia has been symptomatic for twelve months, or that it was expected to last longer than twelve months with treatment. (Tr. 11-12). In light of this, the ALJ found the hernia to be a non-severe impairment.

The ALJ also considered Gaston's claim of tennis elbow. He acknowledged that the symptoms had only began a few weeks prior to the hearing and that there was no evidence of the impairment in the medical record. (Tr. 12) Because there was no evidence of the impairment, the ALJ found the impairment not to be medically determinable. *Id.* The ALJ further found, if the impairment was medically determinable, it would be non-severe because there is no indication that it has lasted twelve months or is expected to last twelve months. *Id.*

Finally, the ALJ addressed Gaston's alleged calf pain. Gaston testified that he had calf pain after standing for a prolong period of time due to the residual effects of a motor vehicle accident. *Id.* Because Gaston did not provide any objective evidence of a lower extremity impairment in the medical record and did not complain to any medical providers of these symptoms, the ALJ found the impairment was not medically determinable.

**IV.  Discussion**

    **A. Standard of Review**

In reviewing the Commissioner's denial of benefits, the Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007) (citation omitted). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

### B. Whether the ALJ erred in finding the claimant's impairments to be non-severe

Gaston argues the ALJ erred in finding his impairments were non-severe because the ALJ failed to apply a *de minimus* standard for determining whether he suffered a severe medical impairment.

The Social Security Administration has established a five-step evaluation process for determining whether an individual is disabled (10 C.F.R. 404.1520(b) and 416.920(a)). If it is determined the claimant is or is not disabled at any step of the evaluation process, the evaluation will not go on to the next step. At the second step of the process, the ALJ must determine whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe. An impairment is severe if it "significantly limits an individual's physical or mental abilities

to do basic work activities." SSR 96-3p. For an impairment to be classified as non-severe it must be "a slight abnormality (or combination of abnormalities) that has no more than a minimal effect on the ability to do basic work activities." SSR 96-3p; *Bowen v. Yuckert*, 107 S. Ct. 2287 (1987). The Eighth Circuit has explained "severity is not an onerous requirement for the plaintiff to meet . . . but it is also not a toothless standard." *Kirby v. Astrue*, 500 F.3d 705, 708 (2007).

In the ALJ's decision, each impairment alleged by Gaston was analyzed and then decided to be either not medically determinable or a non-severe impairment. At issue here are Gaston's alleged impairments caused by his right inguinal hernia, his left shoulder pain, his prostatectomy, and his hypertension, all of which were found to be non-severe impairments.

The ALJ found Gaston's right inguinal hernia to be a non-severe impairment on the grounds that the objective medical records did not indicate the pain level or the lifting restriction alleged by Gaston. (Tr. 11). Furthermore, the ALJ found there was no indication that the hernia had been symptomatic for twelve months or that the condition was expected to last longer than twelve months with treatment. (Tr. 11-12). However, the ALJ erred in reaching this conclusion for the reasons presented below.

First, there appears to be insufficient evidence in the objective medical record for the ALJ to conclude at this stage that the hernia does not constitute a severe impairment. The hernia was initially discovered by Dr. Brehm in February of 2009, and was small and asymptomatic at that time. (Tr. 207). However, in November of 2009, eight months later,

11

Dr. Sandridge noted the hernia had become quite large and was in need of repair. (Tr. 240). The hernia again was noted during a medical visit in May of 2010. Gaston claims his hernia has not been repaired due to economic hardship, and there has been no medical evidence or opinion presented since Dr. Sandridge's findings that would indicate the hernia is not a severe impairment. Because the last medical evidence indicates that the hernia was large and in need of surgical intervention, and the hernia has not been treated, a reasonable mind would not have sufficient evidence on the existing record to conclude that the hernia is not a severe impairment under the *de minimus* standards which must be applied. The fact that Gaston has not received treatment for the hernia due to financial inability to do so cannot be used to conclude that an impairment is non-severe. *See Tome v. Schweiker*, 724 F.2d 711 (8th Cir. 1984) (finding that a claimant's failure to strictly follow dietary and insulin program was justified by lack of sufficient financial resources, and therefore did not preclude finding that her diabetes-related symptoms rendered her disabled and entitled to benefits). However, it is possible that upon further development of the medical record, the ALJ's analysis of the evidence could be upheld, as the subsequent discussion in Section C indicates.

Further, the ALJ did not conduct a proper analysis of Gaston's subjective testimony. If accepted, Gaston's testimony about his right inguinal hernia would easily support a finding of a severe impairment. At the administrative hearing, Gaston testified the hernia causes him pain, especially when walking a distance greater than four blocks or lifting anything heavier than ten pounds. (Tr. 25). Gaston stated a doctor with St. John's

12

hospital placed a ten pound lifting restriction on him, but he could not recall the name of the doctor. *Id.* Gaston also testified he has pain when sitting down for an extended period of time and when the hernia "is out." *Id.* When the hernia is displaced, Gaston has to lie down and push it back in place; this occurs two or three times a day. *Id.*

When an ALJ makes a decision to disregard the subjective testimony on the severity of symptoms, he must explicitly discredit the testimony and give an explanation. *Caviness v. Massanari*, 250 F.3d 605 (8th Cir. 2001). In *Caviness*, the Court held that even if it may be implied that the ALJ did not believe the claimant's testimony, he must still consider the factors set out in *Polaski v. Heckler*, which requires the ALJ to give full consideration to all of the evidence presented relating to subjective complaints, including prior work record, and observations of third parties and treating and examining physicians relating to matters such as: 1) the claimant's daily activities; 2) the duration, frequency, and intensity of the pain; 3) precipitating and aggravating factors; 4) dosage, effectiveness, and side effects of medication; and 5) functional restrictions. 739 F.2d 1320, 1321-22. "The absence of an objective medical basis which supports the degree of severity of subjective complaints alleged is just one factor to be considered in evaluating the credibility of the testimony and complaints." *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984).

In this case, the ALJ's decision did not apply the *Polaski* factors to explain why Gaston's testimony about his hernia was not being given weight nor did he cite to *Polaski* in the decision. Rather, the ALJ simply stated that Gaston's complaints concerning his

13

pain and lifting restrictions were not backed up by objective medical evidence. However, here the objective record documents a large hernia, which appeared to grow significantly over a period of eight months, and thus could be seen by a reasonable mind to support Gaston's complaints. Thus, any discrediting of Gaston's subjective testimony cannot be done through a summary reference to the existing medical record. Even if the medical record is developed further, the failure to apply an appropriate *Polaski* credibility analysis when making the severity determination cannot be considered harmless error in this case. *See Caviness*, 250 F.3d at 605 ("It is for the administrative fact-finder, in the first instance, to make this kind of choice, guided by the proper legal standard. Courts should not make this determination in the first instance, unless the case is clear beyond substantial doubt."). The ALJ's failure to consider the *Polaski* factors requires remand so that the ALJ can apply the proper legal standard for evaluating Gaston's testimony.

### C. Whether the ALJ fully and fairly developed the record before making his decision

This brings the Court to the discussion of Gaston's argument that the ALJ committed reversible error by not developing the administrative record further. While it is the claimant's burden to establish the existence of a disability, the ALJ has the duty of developing the facts fully and fairly. *See Landess v. Weinberger*, 490 F.2d 1187, 1189 (8th Cir. 1974); *Garrett v. Richardson*, 471 F.2d 598, 603 (8th Cir. 1972*); Sellars v. Secretary of H.E.W.*, 458 F.2d 984, 986 (8th Cir. 1972). In order to show the record was not developed, the claimant must show a failure to develop necessary evidence and

14

unfairness or prejudice from said failure. *Haley v. Massanari*, 258 F.3d 742, 749-50 (8th Cir. 2001).

Here, Gaston testified in front of the ALJ as to his impairments and there were approximately 150 pages of medical records before the ALJ. (Tr. 190-347). Among these records were Dr. Brehm's and Dr. Sandidge's treatment notes, complete records from Gaston's emergency room visits and a report from a medical examination Gaston completed for a commercial driver's license. *Id.* There is some doubt as to the rigor of the commercial drivers' license examination, as it did not opine on Gaston's relevant physical limitations, and it was also performed by a nurse practicioner, who is not a valid medical source under 20 C.F.R § 404.1513(a). In this case, the only opinion in the record pertaining to Gaston's physical limitations is from Susie Henry, a single decision maker. (Tr. 226-231). However, this examination is not a valid medical source that may be used to establish medical limitations. 20 CFR 404.1513.

Despite the lack of valid medical opinions, the ALJ did not obtain the testimony of a medical expert, or order a consultative evaluation to better ascertain Gaston's physical limitations. This omission is particularly important with regard to the hernia for the medical evidence on record indicates that there may be a severe impairment. In December 2009, Ms. Henry assessed limitations due to Gaston's hernia and shoulder pain; however, this opinion could not be considered by the ALJ. A consultative evaluation by a valid medical source addressing the same issue of whether Gaston's hernia, and other impairments, produced any physical limitations would assist the ALJ in analyzing both

15

the objective medical records and the subjective testimony proffered by Gaston at his hearing. On remand, the ALJ can determine how to best develop the record so that Gaston's medical records and subjective complaints can be sufficiently evaluated.

The Court also notes that the ALJ found that the claimant's impairments from his prostatectomy, type II diabetes and hypertension were non-severe. (Tr. 11). For these impairments, the medical record appears better developed and provides a stronger basis by which the ALJ can evaluate Gaston's subjective complaints. As the record must be further developed however, upon remand, the ALJ can ensure that the *Polaski* factors are explicitly applied when making his severity determinations for each of these impairments.

### III. Conclusion

It is hereby ORDERED that the matter be REMANDED to the ALJ for reconsideration consistent with this Order.

s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated: July 25, 2012
Jefferson City, Missouri